NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0636n.06
Filed: October 20, 2008

No. 08-5136


UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

CHRISTINA HOWINGTON,

    Plaintiff-Appellant,

v.

QUALITY RESTAURANT CONCEPTS, LLC
and TYLER KIRK,

    Defendants-Appellees.

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE

_____/


BEFORE:    CLAY and KETHLEDGE, Circuit Judges; and OLIVER, District Judge.[*]

    **CLAY, Circuit Judge.**  Plaintiff, Christina Howington, appeals the decision of the district court granting summary judgment to Defendants Quality Restaurant Concepts, LLC ("QRC") and Tyler Kirk with respect to Plaintiff's sexual harassment and retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Tennessee Human Rights Act

---

[*]The Honorable Solomon Oliver, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

1

("THRA"), Tenn. Code Ann. § 4-21-101 *et seq.*[1]  For the reasons stated below, we **REVERSE** the

decision of the district court and **REMAND** the case for trial.

---

[1]Because the Tennessee legislature intended the THRA "to be coextensive with federal law," claims under the THRA follow the same analysis as those under Title VII. *Parker v. Warren County Util. Dist.*, 2 S.W.3d 170, 172 (Tenn. 1999).

## STATEMENT OF FACTS

Plaintiff Christina Howington began working at an Applebee's restaurant owned by Defendant QRC in January of 2006. Defendant Tyler Kirk was a "key hourly manager" at the Applebee's where Plaintiff worked, a role that sometimes placed Kirk in a supervisory position over Plaintiff. According to Plaintiff, Kirk began sexually harassing her shortly after she started working with him.

Plaintiff stated that the first such incident occurred when she went to a local bar called "Wing Doctor" with several of her co-workers, including Kirk. At one point during this outing, Kirk was playing a game that involved retrieving stuffed animals with a crane. After Plaintiff expressed interest in one of the stuffed animals, Kirk offered to win it for her if she would let him "eat the kitty," by which Kirk meant that he wanted to perform oral sex on Plaintiff. (J.A. 31.) Following this incident, Plaintiff avoided social interaction with Kirk.

Nevertheless, according to Plaintiff, Kirk continued to proposition her for sex. When they worked together, Kirk sometimes asked her to come over to his place to "have a few beers," or suggested that she come to his place to have sex. (J.A. 34.) When Plaintiff refused, Kirk asked her, "Why? Don't you have sex? Don't you enjoy having sex? What's wrong with sex?" (*Id.*) Plaintiff was not able to recall how many times Kirk propositioned her, but she says that it happened "every day that [she] worked with him." (J.A. 35.) Plaintiff also claims that Kirk became increasingly aggressive with her. At times, Plaintiff testified, Kirk "scream[ed]" at her in front of her co-workers and customers, and he twice slammed a door in her face. (J.A. 39, 190.) Moreover, Plaintiff stated that Kirk sent her a string of harassing text messages in which he told her that "if [she] didn't have sex with him[, she] wasn't going to be employed [at Applebee's] anymore." (J.A. 190.)

3

According to Plaintiff's deposition testimony, tensions between Plaintiff and Kirk escalated on March 7, 2006. On this date, Chrissy Williams, one of Plaintiff's co-workers who had previously dated Kirk, asked Plaintiff if she could listen to a voicemail message left on Plaintiff's phone. Because QRC's policy prohibited employees from using cell phones while they were working, Plaintiff sought Kirk's permission to allow Williams to use Plaintiff's cell phone. Kirk allegedly told Plaintiff that she and Williams could use the phone as long as they did so in the back of the restaurant. Despite giving Plaintiff and Williams permission to use the cell phone, Plaintiff testified that Kirk later went to the back of the restaurant, snatched the phone out of their hands, and ordered both women to go home. Before leaving the restaurant, Plaintiff spoke with J.B. Hill, a salaried manager who outranked Kirk. Although Plaintiff's testimony is vague regarding the contents of this conversation,[2] she stated that Hill told her to "let [Kirk] blow off his steam," and that she should still "[c]ome back tomorrow." (J.A. 46.)

The next day, March 8, 2006, Plaintiff returned to work. Hill called her into his office, and presented her with a "Written Warning of Violation." (J.A. 81.) According to this written warning, which both Hill and Kirk signed as Plaintiff's supervisors, Plaintiff engaged in "[u]nruly and disrespective [sic] behavior towards [a] manager on duty," and "displayed unprofessional actions . . . directly in front of customers." (Id.) Although Plaintiff signed the form containing the warning, she claims that, while she was meeting with Hill, she informed him that Kirk "had wanted to pursue a relationship and that [she] had told him no," and that, in response, Kirk had "been mean to [her] and cussed [her], [and] had been violent toward [her]." (J.A. 46.) According to Plaintiff, she also

---

[2] Prior to a follow-up question from Defendants' attorney, Plaintiff described her conversation with Hill as follows: "And J.B. told me, because J.B. was there, not to worry about it, blah, blah, blah, blah, blah, just to come back tomorrow, we'll talk about it." (J.A. 44).

told Hill that this treatment was "really starting to affect [her] work" and that she did not want to work with Kirk anymore because she was afraid of him. (J.A. 46.) Plaintiff also testified that she showed Hill text messages[3] that she had received from Kirk in which Kirk had threatened to fire her in an attempt to make her have sex with him. Despite the evidence of sexual harassment which Plaintiff claims to have presented to Hill, Hill allegedly told Plaintiff that he would "try to . . . work on not having [Plaintiff and Kirk] scheduled together," and that she needed to "understand that [Kirk's] . . . a nice-looking guy." (J.A. 46.)

On March 9, 2006, the day after Plaintiff's conversation with Hill, Plaintiff had two letters hand delivered to Applebee's. The first, addressed to Amber Leonard, the restaurant's General Manager, informed Leonard that Plaintiff "ha[s] been a victim of sexual harassment and verbal abuse" by Kirk, and described several of the incidents that occurred after Plaintiff informed Kirk that she "was not interested in a sexual relationship with him." (J.A. 83.) The letter further noted that Plaintiff did not believe Hill had handled her conflict with Kirk in an acceptable manner. The second letter, addressed to Kirk, stated that Plaintiff found his "actions [to] have been so aggressive that [she] do[es] not feel safe within [Kirk's] company," and asked Kirk to "abstain from all contact" with her. (J.A. 84.)

According to an affidavit from Danny Hodge, QRC's Regional Manager, Hodge learned about Plaintiff's letters the same day that they were delivered to the restaurant, and he immediately launched an investigation into Plaintiff's allegations. The next day, Hodge visited the Applebee's

---

[3]Because Plaintiff has not produced copies of the text messages, it is uncertain whether Kirk in fact sent text messages to Plaintiff. Plaintiff received only eleven text messages during her brief time working for QRC and, although Kirk does not explicitly deny sending the messages to Plaintiff, Kirk's affidavit states that none of the eleven text messages came from a number belonging to him.

where Plaintiff worked, reviewed the letters she had written, and interviewed Leonard, Hill, and Eric Bouchet, the restaurant's Assistant Manager. Hodge also made several attempts to speak with Plaintiff over the phone, but Plaintiff told him that "her schedule was busy and she could not talk with [him] then about her harassment complaints." (J.A. 86.) Although Plaintiff and Hodge exchanged several voicemails following this brief conversation, Hodge claims that Plaintiff eventually stopped returning his calls, and that they never discussed the substance of her allegations. Although Plaintiff does not contest most of Hodge's affidavit, she claims that Hodge did not speak with her until after her last day of work at Applebee's.

Plaintiff's employment at Applebee's ended on March 11, 2006, the day after Hodge's visit to the restaurant. On March 11, 2006, Plaintiff parked her car in a place where she could see it through the restaurant's front window because she was concerned that someone might vandalize her car or take her cell phone from her car. Plaintiff's actions, however, violated a QRC policy requiring "all crewmembers [to] park in the back of the building" "[u]nless scheduled to close the restaurant at night . . ." (J.A. 80.) Citing this policy, Kirk ordered Plaintiff to move her car behind the building. When Plaintiff informed Kirk that she did not feel comfortable moving her car to a place where she would be unable to see it from the restaurant, Kirk stated that, if she did not move it, she "could leave and not worry about ever coming back." (J.A. 55.) Plaintiff again refused to move her car, and Kirk told her to "leave" and that she was "done." (J.A. 55, 61.) Plaintiff believed that Kirk terminated her at the end of this exchange. As a result, she left the restaurant, returning only to drop off her uniform and pick up a paycheck.

Despite Kirk's instructions that Plaintiff should leave and never come back to the restaurant, QRC maintains that Kirk did not terminate Plaintiff and, further, that Kirk was not authorized to fire

6

employees. Specifically, Hill claims that during his conversation with Plaintiff on March 8, 2006, he informed her that Kirk lacked such authority. Hodge's affidavit confirms that, within QRC's corporate hierarchy, a key hourly manager such as Kirk does not have the power to fire employees. Further, after Plaintiff refused to move her car, Kirk completed and signed a second written warning to Plaintiff, which states that she would receive a thirty-day cooling-off period, not termination.

After obtaining a right-to-sue letter from the EEOC, Plaintiff filed this case against Kirk and QRC on March 2, 2007, alleging sexual harassment and retaliation. On January 3, 2008, the district court granted summary judgment to Defendants with respect to each of Plaintiff's claims. This appeal followed.

## DISCUSSION

### I. Sexual Harassment Claims

#### *Standard of Review*

The district court granted summary judgment in favor of Defendants on Plaintiff's sexual harassment claims. We review a district court's grant of summary judgment *de novo*. *Farhat v. Jopke*, 370 F.3d 580, 587 (6th Cir. 2004). A grant of summary judgment is appropriate only when "the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact" as to an essential element of the non-moving party's case. Fed. R. Civ. P. 56(c). An issue of fact is "genuine" if a reasonable person could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). After the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

*Analysis*

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). This prohibition encompasses two types of sexual harassment.[4] First, it forbids *quid pro quo* harassment, which occurs when an employee's submission to unwanted sexual advances becomes either a condition for the receipt of job benefits, or the means to avoid an adverse employment action. *See Bowman v. Shawnee State Univ.*, 220 F.3d 456, 461 (6th Cir. 2000). Title VII also "affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult," and, to enforce this right, prohibits conduct that creates a "hostile environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986). Plaintiff claims that Kirk's conduct constituted *quid pro quo* harassment, and that Kirk's actions created a hostile work environment. For the reasons that follow, summary judgment was improper, and both claims should proceed to trial.

A.      *Quid Pro Quo*

When a sexual harassment plaintiff experiences a "tangible employment action," a plaintiff may prevail in a claim against the employer upon proof of the following:

> 1) that the employee was a member of a protected class; 2) that the employee was subjected to unwelcomed sexual harassment in the form of sexual

---

[4]Whether sexual harassment culminates in an adverse employment action determines whether a claim falls within the *quid pro quo* framework, or should be evaluated as a hostile environment claim. As the Supreme Court explained, "[w]hen a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753-54 (1998). In contrast, "[f]or any sexual harassment preceding the employment decision to be actionable, . . . the conduct must be severe or pervasive." *Id.* at 754.

8

advances or requests for sexual favors; 3) that the harassment complained of was on the basis of sex; 4) that the employee's submission to the unwelcomed advances was an express or implied condition for receiving job benefits or that the employee's refusal to submit to the supervisor's sexual demands resulted in a tangible job detriment; and 5) the existence of respondeat superior liability.

*Id.* In this case, Plaintiff is part of a protected class because she is a woman, and Defendants do not contest that Kirk made unwelcomed advances. It is also uncontested that the harassment was based on Plaintiff's sex. Thus, whether the district court properly granted summary judgment to Defendants depends on whether a reasonable jury could find that Plaintiff has proven the final two elements of her claim.[5]

### 1. *Respondeat Superior Liability*

To prevail on a *quid pro quo* claim, a plaintiff must demonstrate the existence of respondeat superior liability. *Id.* "Under the theory of respondeat superior, employers are held strictly liable for conduct of supervisory personnel who have plenary authority to hire, fire, promote, and discipline employees." *Kauffman v. Allied Signal, Inc.*, 970 F.2d 178, 186 (6th Cir. 1992). Strict liability, however, is not limited to supervisors with such broad authority. Rather, "all that is required is that the employee have 'significant control' of those duties." *Id.*

In claiming that summary judgment was appropriate, Defendants emphasize that, as a very junior supervisor within QRC's corporate structure, Kirk lacked the power to hire and fire employees. The record suggests, however, that even if QRC's policy did not authorize Kirk to

---

[5]Defendant claims that Plaintiff has waived her *quid pro quo* sexual harassment claim by failing to raise it on appeal. This argument lacks merit, as Plaintiff expressly argues in her brief that "Mr. Kirk was acting formally in his capacity as a supervisor in sending Ms. Howington home, and writing her up as he did. It was the act of a supervisor bringing the official power of the enterprise to bear on his subordinate, and therefore the employer should be strictly liable if the act was illegally motivated." Pl.'s Br. 11–12 (citations omitted).

terminate employees, Kirk exercised "significant control" over personnel matters because of his apparent unilateral authority to discipline his subordinates. Defendants do not contest that, on two separate occasions, acting solely on his own authority, Kirk ordered Plaintiff to leave the restaurant. Further, after refusing to move her car, Plaintiff received a thirty-day suspension from her job, and the discipline form memorializing her suspension lists Kirk as the supervisor approving the disciplinary action. Thus, although Kirk might have lacked authority to fire Plaintiff, he imposed significant disciplinary measures of only slightly less severity than termination. We believe that such unilateral authority constitutes "significant control" over personnel matters, and is thus sufficient to render QRC vicariously liable for Kirk's actions. *See id.*

2. ***Tangible Job Detriment Resulting From Refusal***

Plaintiff also must demonstrate that her "submission to [Kirk's] unwelcomed advances was an express or implied condition for receiving job benefits[,] or that [her] refusal to submit to [Kirk's] sexual demands resulted in a tangible job detriment." *Bowman*, 220 F.3d at 461. Thus, Plaintiff may

prevail if she demonstrates that she experienced an adverse employment action,[6] and that this action occurred because of her refusal to have sex with Kirk.

### a. Tangible Job Detriment

While *de minimis* employment actions and "very temporary" actions are not materially adverse and, thus, not actionable under Title VII, *Bowman*, 220 F.3d at 462, those involving changes such as a termination or a suspension constitute adverse employment actions. *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008). We have also recognized that a "loss of pay or benefits" can constitute a tangible job detriment. *See Thornton v. Fed. Express Corp.*, 530 F.3d 451, 454-55 (6th Cir. 2008). The record in this case is unclear as to whether Plaintiff lost any of her hourly wages when Kirk sent her home from work in either instance. Plaintiff, however, also earned wages through tips as a day-shift bartender. As a result, Plaintiff undoubtedly lost compensation in the form of unearned tips for the days she was not at work after Kirk sent her home. Accordingly, a reasonable jury could find that Plaintiff has satisfied this element of her *prima facie* case.

---

[6]Defendants contend Plaintiff cannot, after arguing in district court that she was terminated, assert that the suspension constituted the adverse employment action. This argument is without merit. Plaintiff's opposition to Defendants' motion for summary judgment effectively informed Defendants and the district court that Plaintiff believed she experienced a tangible job detriment when Kirk told her to leave work, and that she believes he did so because of her refusal to have sex with him. Arguments raised in a district court filing offered in opposition to a motion for summary judgment are preserved for appeal. *See Vencor, Inc. v. Standard Life and Acc. Ins. Co.*, 317 F.3d 629, 642 n.11 (6th Cir. 2003); *see also Swinney v. Gen. Motors Corp.*, 46 F.3d 512, 522 (6th Cir. 1995) (noting that an issue presented to a district court is preserved for appeal as long as the issue was presented to the district court in a manner which "places the opposing party and the court on notice that a new issue is being raised"). Defendants further argue that, had they understood Plaintiff's filings in the district court to encompass a claim that she experienced a tangible work detriment other than firing, they would have conducted additional discovery and argued to the district court that Kirk had a legitimate, non-discriminatory reason for disciplining Plaintiff, thus entitling them to relief. *See* Defs.' Br. 21–22. This defense, however, is viable regardless of whether Plaintiff was terminated or merely suspended. *See Bowman*, 220 F.3d at 461.

11

### b. Causal Relationship

The only remaining question is whether a reasonable jury could find that Plaintiff was disciplined because of her refusal to have sex with Kirk. *See Bowman*, 220 F.3d at 461. According to Plaintiff's deposition, Kirk propositioned her for sex "every day that [she] worked with him," (J.A. 35) he became increasingly aggressive with her as she continued to refuse his advances, and he sent her text messages stating that "if [she] didn't have sex with him [she] wasn't going to be employed there anymore." (J.A. 190.) These facts are sufficient to allow a reasonable jury to infer that Kirk disciplined Plaintiff because of her refusal to have sex with him. *Cf. Idusuyi v. State of Tenn. Dep't of Children's Servs.*, 30 F. App'x 398, 401 (6th Cir. 2002) (finding no causal relationship between refusal of sexual advances and the adverse employment action when alleged harasser did not participate in making the adverse decision).

In addition, Defendants present no evidence to rebut Plaintiff's claim that Kirk repeatedly propositioned her for sex. Defendants, however, contest Plaintiff's claim that Kirk sent her text messages threatening to have her fired if she did not have sex with him. After Plaintiff introduced a copy of her cell phone records into evidence, Kirk stated in an affidavit that "[n]one of the numbers listed in [Plaintiff's phone records] ever belonged to me." Kirk's affidavit, however, is only two paragraphs long, and does not at any point deny that he sent threatening text messages to Plaintiff, but denies only that he sent text messages to her from his own phone number. Thus, it remains unclear whether Plaintiff received text messages from Kirk, presenting a genuine issue of material fact relevant to determining whether a causal relationship existed between the adverse employment

action and Plaintiff's refusals. As a result, we conclude that the district court improperly granted summary judgment to Defendants with respect to Plaintiff's *quid pro quo* claim.[7]

**B.       Hostile Work Environment**

Plaintiff claims that Kirk's conduct throughout the course of her employment created a hostile environment. To prevail on her claim, Plaintiff must first establish a *prima facie* case. *See Clark v. UPS*, 400 F.3d 341, 347 (6th Cir. 2005). Specifically, Plaintiff must show that: "(1) she is a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on her sex; (4) the harassment created a hostile work environment; and that (5) the employer is vicariously liable." *Id.* (formatting altered).

"For any sexual harassment preceding [an] employment decision to be actionable, . . . the conduct must be severe or pervasive." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754 (1998). Except in cases of truly egregious conduct, a workplace does not become a hostile work environment on the basis of isolated incidents of harassment. Rather, Plaintiff must show that her workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

---

[7]Defendants also claim that *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) entitle them to an affirmative defense against Plaintiff's sexual harassment claim because QRC "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and Plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth*, 524 U.S. at 765. This affirmative defense, however, is not available "when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Id.* Because Kirk's alleged harassment of Plaintiff culminated in her suspension from work, Defendants may not assert the *Ellerth*/*Faragher* affirmative defense.

In addition, "[b]oth an objective and a subjective test must be met: the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive." *Bowman*, 220 F.3d at 463. This is not a "mathematically precise test," and, thus, the question of whether a particular work environment was tainted by severe or pervasive harassment will necessarily depend on the facts of a particular case. *Harris*, 510 U.S. at 22. Factors to consider in evaluating a hostile environment claim include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23. This Court considers "the totality of the circumstances in determining whether the harassment was sufficiently severe or pervasive." *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006).

Plaintiff alleges that Kirk's conduct created a hostile work environment. Throughout her employment, Kirk asked Plaintiff to have sex with him "[p]retty much[] every day that [she] worked with him." (J.A. 35.) Second, during an after-work outing, Kirk asked to perform oral sex on her, and he did so by using a vulgar term for Plaintiff's genitals. Kirk also became increasingly angry with Plaintiff, and would sometimes yell at her in front of customers or slam a door in her face.[8] Finally, Kirk sent multiple text messages to Plaintiff threatening to have her fired if she did not have sex with him, and disciplined Plaintiff on two separate occasions.

---

[8]Although there is nothing inherently sexual about yelling or slamming doors, this Court has held that non-sexual behavior may comprise part of a sexual harassment claim when that behavior "could well be viewed as work-sabotaging behavior that creates a hostile work environment." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 564 (6th Cir. 1999). Thus, to the extent that Kirk's angry outbursts were an attempt to sabotage Plaintiff because she refused to have sex with him, they may be considered in determining whether Plaintiff experienced a hostile work environment.

14

In *Clark v. United Parcel Service, Inc.*, two UPS employees, Sandra Clark and Rhonda Knoop, brought hostile work environment claims against their employer, both claiming that Eli Brock, a supervisor, harassed them. 400 F.3d 351, 344 (6th Cir. 2005). Knoop alleged that, over a period of two-and-a-half years, Brock routinely told sexual jokes in front of her, twice placed his vibrating pager against her upper thigh and asked if it "felt good," and once grabbed the back of her overalls and tried to look down them. *Id.* at 344-35. Nevertheless, the court found that, other than Brock's sexually inappropriate jokes, Knoop had experienced only three incidents of harassment in over two years, and that such "isolated incidents" did not rise to the level of creating a hostile work environment. *Id.* at 352. Moreover, the Court held that Brock's jokes were "not enough to elevate the isolated incidents to an ongoing and pervasive hostile environment." *Id.*

Although the court held that Knoop's allegations were insufficient to sustain a hostile environment claim, it reached the opposite result with respect to Clark. As with Knoop, Brock used his vibrating pager to harass Clark by tossing it in between her legs when she was sitting and asking her if it "fe[lt] good." *Id.* at 345. Clark, however, also described sixteen other incidents involving Brock, including a time when Brock placed a bag of potato chips on his crotch and encouraged Clark to reach her hand into the bag, and a time when he physically restrained Clark and scratched his finger against her palm. *Id.* Although the court believed that Clark's allegations were "similar in kind to Knoop's," the court held that they were sufficient to survive a motion for summary judgment because Clark presented "more of an ongoing pattern of unwanted conduct and attention by Brock." *Id.* at 352.

The court in *Clark* also cited *Stacy v. Shoney's, Inc.*, No. 97-5393, 1998 WL 165139 (6th Cir. Mar. 31, 1998) to support its conclusion. In *Stacy*, a waitress's supervisor began "harassing her with

15

sexually suggestive comments and leering looks." *Id.* at *1. When they did not work the same shift, the supervisor would call her at home and say that he "missed her," and when they did work together, he would comment, for example, that her "tan sure does look good" and that he "wish[ed] [he] could see more of it." *Id.* The supervisor also told her that "if [he] had someone that looked like [her], [he]'d not let them leave the house." *Id.* The waitress also reported an incident when the supervisor inappropriately touched her breast. *Id.* Despite the supervisor's statements and actions, the court held that the supervisor's conduct was not "sufficiently frequent, severe, physically threatening, or humiliating to unreasonably interfere with [the] [p]laintiff's work performance to constitute actionable work place harassment." *Id.* at *3. As a result, the court found the plaintiff's hostile environment allegations insufficient to survive summary judgment. *Id.*

In this case, Plaintiff has alleged harassment that occurred on an "ongoing" basis, similar to the pattern of unwanted conduct this Court found sufficient to survive summary judgment in *Clark*. *Clark*, 400 F.3d at 352. Kirk's harassing behavior, in asking her to have sex with him, occurred every day that Plaintiff worked with him, and he frequently yelled at her while she was working. He also sent her, on more than one occasion, text messages threatening to fire her if she did not submit to his advances. Thus, Kirk's behavior was continuous and "commonplace" in the work environment. *See Abeita v. Transam. Mailings, Inc.*, 159 F.3d 246, 252 (6th Cir. 1998). Although Plaintiff is unable to describe more than a few specific incidents of harassment, when a plaintiff claims ongoing harassment, the "inability to recount any more specific instances goes to the weight of her testimony, a matter for the finder of fact[]." *Id.* While each of the incidents Plaintiff describes, viewed separately, would not be sufficient to demonstrate Kirk created a hostile work environment, a reasonable person could find that all of Kirk's actions, taken together, were

16

sufficiently severe or pervasive. *See Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999). We conclude that Plaintiff has presented an issue for the fact finder as to whether Kirk's actions were sufficiently severe or pervasive. As a result, summary judgment was inappropriate.

## II. Retaliation

### *Standard of Review*

The district court granted summary judgment with respect to Plaintiff's retaliation claim. A district court's grant of summary judgment is reviewed *de novo*. *Farhat*, 370 F.3d at 587.

### *Analysis*

In addition to prohibiting employment discrimination on the basis of sex, Title VII, in a separate provision, also forbids employers from retaliating against an employee because the employee either opposed any practice Title VII makes unlawful, or filed a charge under Title VII. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006) (citing 42 U.S.C. § 2000e-3(a)). To establish a *prima facie* case of retaliation under Title VII, Plaintiff must establish that: "(1) [s]he engaged in activity protected by Title VII; (2) the exercise of h[er] civil rights was known to the defendant; (3) thereafter, the defendant took an employment action adverse to [Plaintiff]; and (4) there was a causal connection between the protected activity and the adverse employment action." *Arendale v. City of Memphis*, 519 F.3d 587, 606 (6th Cir. 2008).

Plaintiff has easily established the first two prongs. First, because Title VII protects an employee who "complain[s] to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices," her letters to Kirk and to the restaurant's general manager, which complained about Kirk's allegedly harassing activities, constitute protected activity. *See Johnson*

17

*v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000). Second, those letters also placed Defendants on notice that Plaintiff was exercising her rights under Title VII.

Plaintiff also has established the third prong. Following the receipt of Plaintiff's letters, Defendants suspended Plaintiff from her job for thirty days. Because the suspension "would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination,'" *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008) (quoting *Burlington*, 548 U.S. at 68), Defendants' act of suspending Plaintiff constitutes an adverse employment action for purposes of her Title VII retaliation claim. *See Burlington*, 548 U.S. at 56 (noting that, for purposes of Title VII retaliation claims, an employer's action constitutes an adverse employment action when "a reasonable employee would have found [the action] materially adverse").

As a result, Plaintiff's retaliation claim turns on whether a reasonable jury could find a causal connection between Plaintiff's complaint and her suspension. At the *prima facie* stage, a plaintiff must only "put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity." *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000). When an employee is disciplined in close proximity to his or her protected activity, such proximity provides "highly probative evidence of a causal connection" between the adverse employment action and the protected activity. *Arendale*, 519 F.3d at 606. We have often noted that temporal proximity alone is not sufficient to support a retaliation claim, *e.g.*, *Nguyen*, 229 F.3d at 566, and that plaintiffs generally must show temporal proximity combined with "other compelling evidence" of retaliation to support their claims. *Id.* We have also acknowledged, however, that "there may be circumstances where evidence of temporal proximity alone would be sufficient to support [an] inference" of retaliation. *Id.* at 567; *see also Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 524-25 (6th Cir.

18

2008) (discussing additional cases that have suggested temporal proximity alone is sufficient). Further, no case holds that "temporal proximity alone may *never* show a causal connection." *Mickey*, 516 F.3d at 524 (emphasis added).

Most recently, this Court found that a plaintiff established a causal connection for purposes of his retaliation claim when he demonstrated that his employer fired him the same day the employer learned of his EEOC complaint. *Mickey*, 516 F.3d at 525. Thus, we concluded that, "where an employer fires an employee immediately after learning of the protected activity, we can infer a causal connection between the two actions, even if [the plaintiff] ha[s] not presented other evidence of retaliation." *Id.* In reaching its conclusion, this Court reasoned that temporal proximity must be sufficient to show retaliation "if an employer immediately retaliates against an employee upon learning of his protected activity" because, in such cases, "the employee would be unable to couple temporal proximity with any such other evidence because the two actions happened consecutively . . . ." *Id.* at 525.

This reasoning is equally applicable to Plaintiff's circumstances. Plaintiff's letters complaining of Kirk's alleged sexual harassment were delivered to Applebee's on March 9, 2006. Kirk suspended Plaintiff two days later. While a two-day lapse is not as close in time as the same-day termination in *Mickey*, Plaintiff, like the plaintiff in *Mickey*, is unlikely to be able to point to additional retaliatory conduct that occurred within the two-day window.[9] As a result, we conclude

---

[9]In addition, it is not clear whether Plaintiff worked the same day the letters were delivered, or even the day after. A friend of Plaintiff delivered the letters to the restaurant; it is unclear whether Plaintiff was also working at the restaurant that day. If March 11, 2006, was the first opportunity Kirk had to retaliate against Plaintiff, Plaintiff's situation is indistinguishable from that in *Mickey*. *See Geiger v. Pfizer, Inc.*, No. 2:06-CV-636, 2008 WL 4346781, at *8 (S.D. Ohio Sept. 18, 2008) (finding that the plaintiff's retaliation claim survived summary judgment because, although four months passed between the protected activity and the alleged adverse employment action, the

that this is one of the "limited number of cases" in which "we can infer a causal connection . . . even [without] other evidence of retaliation." *Mickey*, 516 F.3d at 525.

To rebut Plaintiff's *prima facie* case, Defendants argue only that no retaliatory action occurred because Kirk lacked authority to terminate Plaintiff. Kirk, however, disciplined Plaintiff and imposed a thirty-day suspension. As discussed above, the suspension constituted a materially adverse employment decision actionable under Title VII because the suspension would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Niswander*, 529 F.3d at 720. Thus, Plaintiff has presented sufficient evidence to allow a jury to find that she suffered an adverse employment action because of her complaints regarding Kirk's sexual harassment. Accordingly, we conclude that the district court improperly granted Defendants' motion for summary judgment with respect to Plaintiff's retaliation claim.

## CONCLUSION

For the foregoing reasons, we **REVERSE** the decision of the district court and **REMAND** this case for trial.

---

proximity was sufficiently "close," "especially considering that it was the first opportunity for such adverse action to be taken").

20