724

Loretta CHOATE, Plaintiff,

v.

ADVANCE STORES COMPANY, INC.,
d/b/a Advance Auto Parts, Inc.,
Defendant.

Civil No. 3:13-cv-1376

United States District Court,
M.D. Tennessee, Nashville Division.

Filed 11/18/2015

Andy L. Allman, Allison S. Porter, Jedidiah L. Cochran, Andy L. Allman & Associates, Hendersonville, TN, for Plaintiff.

Richard C. Paul, Jackson Lewis LLP, Memphis, TN, Yvonne Norris Maddalena, Jackson Lewis P.C., Birmingham, AL, for Defendant.

## MEMORANDUM

KEVIN H. SHARP, UNITED STATES DISTRICT JUDGE

Plaintiff Loretta Choate brings claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111, Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e, and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4–21–101. She also brings retaliation claims under Title VII and the THRA. Defendant Advance Stores Company moves for summary judgment on all of Plaintiff's claims. (Docket No. 42.)

The Court will grant Defendant's motion.

## BACKGROUND

This is a dispute over Plaintiff Loretta Choate's termination from an Advance store. The Court offers some background information to help explain how that dispute arose.

Plaintiff began working for Defendant in 2003. She quit sometime in 2005, but was soon asked to return as General Manager of a store in White House, Tennessee. In October 2011, she became the General Manager of a store Gallatin, Tennessee. She remained in that position until she was fired in January 2013.

Jon Mattson is Plaintiff's direct supervisor. He manages several of Defendant's stores in the area, but he regularly spoke with Plaintiff about the Gallatin store. By his estimate, the two spoke "two to three times a week," and he "visit[ed] the store ... about twice a month, on average." (Docket No. 44, Ex. 2, p. 2.)

As her supervisor, Mattson was responsible for evaluating Plaintiff's work. In early 2012, he rated her work "satisfactory," but downgraded her performance to "challenging" in September 2012. (Docket No. 44, Ex. 2, p. 3.) He explained that the poor rating reflected deficiencies in "a number of categories[,] [s]ome of them merchandising related, some of them staffing related," and "[s]everal profit related." (Docket No. 44, Ex. 2, p. 3.) He also said that the store's turnover was high, which could indicate more serious problems with the store's management. (Docket No. 44, Ex. 2, p. 3.)

As time went on, Mattson became more concerned with Plaintiff's performance. On October 12, 2012, Mattson put Plaintiff on a Performance Improvement Plan ("PIP") (Docket No. 44–2, pp. 52–53). The PIP was intended to "show[ ] critical areas [in which] the [Gallatin] store was trailing in performance." (Docket No. 44, Ex. 2, p. 4.) All of these areas, Mattson explains, were "tied directly to sales and profit." (Docket No. 44, Ex. 2, p. 4.) The PIP included a set of "Action Item(s)" for Plaintiff to complete in order to boost the store's performance: it called on Plaintiff to "[e]nsure proper coverage of phones," "[l]imit smoke breaks for employees," and have discussions with employees about "acceptable levels of service." (Docket No. 44–2, pp. 52–53.)

On October 26, 2012, Plaintiff went on leave to seek treatment for alcoholism and bipolar disorder. Her leave lasted one month—two weeks in an inpatient facility, then two weeks in an outpatient treatment program. Plaintiff first spoke to Mattson about her leave during her outpatient treatment. (She could not contact him during her inpatient treatment, but her daughter called Mattson in late October to tell him that Plaintiff was being treated for alcoholism.) Plaintiff returned to work on November 26, 2012. When she returned, she felt that the store was in disarray: everything was suddenly "on fire," in "total chaos," and "turned upside down." (Docket No. 44, Ex. 1, pp. 8, 15.)

This "chaos" stemmed from a string of disciplinary issues in the store. (Docket No. 44, Ex. 1, p. 8.) Shortly after she returned, Mattson told Plaintiff that an employee named Ryan Cleary had been stealing merchandise from the Gallatin store. Mattson asked Plaintiff "g[e]t additional information" about the employee, including "cash shortages that tied back to him." (Docket No. 44, Ex. 2, p. 6.) After they confirmed that Cleary was responsible, Plaintiff and Mattson agreed that "[Cleary] needed to be terminated." (Docket No. 44, Ex. 1, p. 29.)

Around this time, Plaintiff felt that Mattson suddenly began "microman-ag[ing]" her decisions. (Docket No. 44, Ex. 2, p. 8.) Her Complaint points to one instance when Mattson asked Plaintiff if she had rehired an employee, Daniel Lamberth, who had been fired for stealing. Plaintiff explained that Lamberth had "left for personal reasons" and had not been fired. (Docket No. 44, Ex. 2, p. 6.) But Plaintiff believed that Mattson had "doubted [her] judgment." (Docket No. 1, p. 3.) Mattson also asked Plaintiff to assist him in firing Cleary. Although she concedes that "a [District Leader] has a right to sit in on a termination," she "had never had a [District Manager] sit in" before. (Docket No. 44, Ex. 1, pp. 15–16.) According to Plaintiff, both events suggested that Mattson was "question[ing] her authority and judgment;" she "felt like [she] wasn't being able to manage [her] store anymore." (Docket No. 1, p. 3; Docket No. 44, Ex. 1, p. 31.)

More problems emerged in December 2012. Around that time, an employee named Christina Pettit approached Mattson and told him that she had found a receipt for alcohol in a commercial truck. Store records revealed that an employee named Shelley Robinson had been using the truck when the alcohol was purchased. Mattson prepared termination papers for Robinson and gave them to Plaintiff, instructing her to speak with Robinson.[1]

---

1. The parties disagree as to whether Mattson ordered Plaintiff to fire Robinson. Plaintiff maintains that Mattson told her to fire Robinson, but Mattson testified that he instructed Plaintiff to fire Robinson only if Robinson admitted to buying the alcohol. Plaintiff admits, though, that "[a]s a district leader,

Plaintiff confronted Robinson, but Robinson "flat out denied" buying alcohol during work hours. (Docket No. 44, Ex. 1, p. 9.) Mattson then told Plaintiff to suspend Robinson for a few days while they continued to investigate.

Soon after Robinson returned to work, Pettit—the employee who found the liquor-store receipt—approached Mattson and told him that Robinson "was harassing her." (Docket No. 44, Ex. 2, p. 9.) Petit told Mattson that Robinson was friends with Plaintiff, and that "given the nature of [Robinson] and [Plaintiff's] relationship or close friendship, [Pettit] felt her job may be in jeopardy." (Docket No. 44, Ex. 2, p. 9.) Pettit later told Mattson that Robinson had contacted her and warned her that "[Robinson] would find out who" had told Mattson about the receipt. According to Pettit, Robinson told her that "karma is a bitch." (Docket No. 44, Ex. 2, Ex. 11.)

Mattson spoke to Tracy Kalteux, a human-resources manager for Advance. The two concluded that Robinson had "clear[ly] violated [Advance's] code of ethics" by "questioning people in the store to find out who filed the complaint" against her. (Docket No. 44, Ex. 3, p. 5.) They also concluded that Plaintiff had "completely mismanaged the investigation" and violated the code of ethics by allowing Robinson to harass Pettit. (Docket No. 44, Ex. 3, p. 5.) They decided to transfer Robinson to another store in Portland, Tennessee.

Mattson and Kalteux testified that Plaintiff "did not want [Robinson] transferred" and was "surprise[d]" by the decision. (Docket No. 44, Ex. 2, p. 9; Ex. 3, p. 4.) On December 31, 2012, Plaintiff emailed Kalteux. Plaintiff wrote that "there has been [a lot] of drama in [her] store that was never there before" she took leave.

(Docket No. 44-2, pp. 1–2.) Her message included several paragraphs about Robinson's suspension and transfer; Plaintiff complained that the process had "humiliated" Robinson. (Docket No. 44-2, pp. 1–2.) She also wrote that it was "hard to keep a team motivated ... with this kind of drama going around the store." (Docket No. 44-2, p. 2.)

Mattson grew frustrated with Plaintiff's focus on Robinson. According to Mattson, Plaintiff's "focus was always on [Robinson's transfer]." (Docket No. 44, Ex. 1, p. 15.) She continually steered their conversations towards the topic and repeatedly told him that Robinson was "struggling with" the transfer. (Docket No. 44, Ex. 2, p. 10.) Meanwhile, the store's performance continued to deteriorate: of all of the "item[s] on the Performance Improvement Plan, not one of them got done." (Docket No. 44, Ex. 1, p. 15.)

On January 8, 2013, Plaintiff called a human-resources hotline for Advance employees. She said that employees at the Gallatin store "ha[d] been creating drama" after Robinson's suspension. (Docket No. 44-2, p. 49.) She also complained about "[u]nfair treatment" from Mattson. (Docket No. 44-2, p. 49.) Two days later, a human-resources employee confirmed that there was "no evidence of inappropriate ... behavior" from Mattson. (Docket No. 44-2, p. 50.) Plaintiff's complaint was deemed to be "[w]ithout [m]erit." (Docket No. 44-2, p. 50.)

On January 15, 2013, Plaintiff called Mattson and told him that she would be late for work because she needed to buy a new car battery. (Advance requires a General Manager to call her District Leader to report when she will be unable to report for scheduled work. (Docket No. 44, Ex.

[Mattson] has the right to terminate one of [Plaintiff's] employees." (Docket No. 44, Ex.

1, p. 12)

p. 11; Ex. 3, p. 5.)) While Plaintiff was on her way to get a car battery, Robinson called and told Plaintiff that she "didn't want to live anymore." (Docket No. 44, Ex. 1, p. 18.) Plaintiff left immediately for Robinson's home.

Plaintiff stayed with Robinson until the early evening. Throughout the day, Plaintiff called several other employees at the Gallatin store: she "talked to [one employee] four or five times," and "probably talked to [another employee] twice." (Docket No. 44, Ex. 1, p. 19.) She also believes that she spoke with Pettit at some point that day. But she never called Mattson to report her absence. After calling the Gallatin store four times, Mattson finally reached Plaintiff around 5:00 PM. Plaintiff explained why she had been absent and told Mattson that her cell phone had died earlier in the day.

Mattson fired Plaintiff the next morning. In a report that he presented to Plaintiff, Mattson wrote that Plaintiff had shown a "profound lack of judgment" and "gross misconduct" in managing the Gallatin store. (Docket No. 44, Ex. 2, p. 4.) He wrote that Plaintiff had failed to "maintain[ ] a workplace free from harassment." (Docket No. 44, Ex. 2, p. 4.) He concluded that "her relationship with [Robinson] ha[d] clouded her judgment" and made her an "ineffective leader." (Docket No. 44, Ex. 2, p. 4.)

Plaintiff signed her discharge papers. Below her signature, she wrote that she "[did] not agree with all the statements" in the termination report. (Docket No. 44, Ex. 2, p. 4.) She also wrote that she "never treated [Pettit] different" from other employees and felt that she was being fired because she contacted human resources about the problems in her store. (Docket No. 44, Ex. 2, p. 4.)

This action followed.

## LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); Whitfield v. Tennessee, 639 F.3d 253, 258 (6th Cir.2011) (quoting). A court must draw all reasonable inferences in favor of the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, the nonmoving party must rely on more than "[c]onclusory assertions, supported only by [its] own opinions." Arendale v. City of Memphis, 519 F.3d 587, 605 (6th Cir.2008). Instead, the nonmoving party must set out specific facts showing a genuine issue for trial. Harvey v. Campbell Cty., Tenn., 453 Fed. Appx. 557, 561 (6th Cir.2011).

## ANALYSIS

All four of Plaintiff's claims rely on indirect evidence.[2] The Court will therefore use the burden-shifting analysis set out in McDonnell Douglas Corporation v. Green, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this framework, a plaintiff must first make out a prima facie case for the violation; next, the burden shifts to the defendant to articulate a nondiscriminatory reason for the adverse action. McDonnell Douglas, 411 U.S. at 802–04, 93 S.Ct. 1817; Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 703 (6th Cir. 2008). The burden then shifts back to the plaintiff to prove that the defendant's explanations are pretextual. Id.

---

**2.** Unlike direct evidence, indirect evidence requires some kind of logical inference. See Younis v. Pinnacle Airlines, Inc., 610 F.3d 359, 363 (6th Cir.2010). Cf. Smith v. Chrysler Corp., 155 F.3d 799, 805 (6th Cir.1998) ("'[Direct] evidence would take the form, for example, of an employer telling an employee, 'I fired you because you are disabled.'"").

### I. ADA Claim (Count I)

Plaintiff claims that Defendant fired her because of her disability. (See Docket No. 1, p. 8 ("Defendant's decision to terminate Plaintiff resulted from a knowing and intentional pattern of discrimination in violation of the [ADA].").) Title I of the ADA provides that a covered employer "shall [not] discriminate against a qualified individual on the basis of disability in regard to ... discharge of employees, ... and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

### A. Plaintiff's Prima Facie Case

Both parties set out a three-element test for showing a prima facie case under the ADA. That test would require Plaintiff to show that "she (1) was disabled within the meaning of the ADA[;] (2) was qualified to perform the essential functions of her job with or without a reasonable accommodation[;] and (3) suffered an adverse employment action as a result of her disability." (Docket No. 43, p. 3.) Under this test, Plaintiff would also need to "prove that her disability was the 'but-for' cause of any adverse employment action." (Docket No. 43, p. 4, citing Lewis v. Humboldt Acquisition Corp., Inc., 681 F.3d 312, 321 (6th Cir.2012).)

■ This is the wrong legal standard. The Sixth Circuit has held that the three-element test is not the "proper test" for a prima facie ADA-discrimination claim. See Whitfield, 639 F.3d at 258. Instead, a plaintiff's prima facie ADA-discrimination claim must satisfy a five-element test. Id. See also Notarnicola v. Johnson Controls, Inc., 2014 WL 1304591, at *4–5 (E.D.Mich. Mar. 28, 2014) (citing White v. Standard Ins. Co., 529 Fed.Appx. 547 (6th Cir.2013)). The five-element test would require Plaintiff to show that (1) she was disabled; (2) she was otherwise qualified for the position; (3) she suffered an adverse employment decision; (4) Defendant knew of or had reason to know of her disability; and (5) she was replaced. Whitfield, 639 F.3d at 258; Hildebrand v. Dollar Gen. Corp., Inc., 2013 WL 3761291, at *7 (M.D.Tenn. July 16, 2013).

■ Moreover, passing the "but-for" test is not required for Plaintiff's prima facie case. This is appropriate at the "pretext" stage, after Defendant has shown legitimate, nondiscriminatory reasons for Plaintiff's termination. See Wright v. Memphis Light, Gas & Water Div., 558 Fed.Appx. 548, 554 (6th Cir.2014) (applying the "but-for" test at the pretext stage of an ADA discrimination claim).

The Court will therefore apply the five-factor test adopted in Whitfield. 639 F.3d at 258. The burden will then shift to Defendant to proffer a legitimate, nondiscriminatory reason for the adverse employment action. At the pretext stage, Plaintiff will need to show that her disability was a "but-for" cause of her termination. See Wright, 558 Fed.Appx. at 554.

The parties agree that Plaintiff has shown the first three elements of the five-element test. Defendant concedes that Plaintiff "was disabled within the meaning of the ADA and was qualified to perform the essential functions of her job." (Docket No. 43, p. 4 n. 2.) And neither party disputes that Plaintiff's termination would constitute an "adverse employment decision" as defined by the ADA. (Docket No. 43, p. 4 ("Advance concedes discharge is an adverse employment decision.").)

■ But the parties failed to brief the fourth and fifth elements—that Defendant knew of Plaintiff's disability and that Plaintiff was in fact replaced. See Whitfield, 639 F.3d at 258. As the movant, Defendant had the initial burden of citing particular facts to support its argument. Celotex v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Defendant did not carry this burden. Instead, it

pointed only to evidence that Plaintiff's disability was not a "but-for" cause of her firing. As the Court explained above, that question is properly analyzed at the pretext stage of an ADA-discrimination claim.

Defendant has failed to show that Plaintiff d the fourth and fifth elements of her prima facie case. See Notarnicola, 2014 WL 1304591, at *6. The Court therefore concludes that all five elements are satisfied. See FED. R. CIV. P. 56(e)(2) ("If a party fails to properly support an assertion of fact ... the court may: ... consider the fact undisputed for purposes of the motion[.]").

**B. Legitimate Reasons and Pretext**

■ Defendant argues that Plaintiff was not fired because of her disability, but because she was a poor manager who ignored company policies. Defendant points to Plaintiff's poor track record from October 2012 through January 2013: over those three months, Plaintiff failed to improve her store's performance, even after getting low evaluation marks and being placed on a PIP in October 2012; she mishandled Robinson's investigation; she failed to keep Robinson from harassing Pettit; and she failed to report her absence on January 15, 2013. These mistakes, Defendant argues, are more than enough to justify Plaintiff's termination.

Plaintiff contends that Defendant's reasons are mere pretext, arguing that Mattson showed discriminatory animus when Plaintiff returned from treatment in November 2012. Plaintiff points out that Mattson "treated her differently after her leave," "micromanag[ed]" her, and questioned her "authority and judgment." (Docket No. 46, p. 8.) She also points out that Mattson "no longer involved [Plaintiff] in decisions about the store" and kept her from "manag[ing] her store herself anymore." (Docket No. 46, p. 9.)

■ The Court agrees with Defendant. There are three ways that a plaintiff may demonstrate that an employer's nondiscriminatory reasons are pretextual: (1) by showing that the reasons have no basis in fact; (2) by showing that the reasons did not actually motivate the employer's action; or (3) by showing that the reasons were insufficient to motivate Defendant's action. Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir. 1994). Plaintiff has failed to show how Defendant's reasons fit any of these three categories.

First, there is ample factual support for Defendant's position. In their depositions, Plaintiff, Mattson, and Kalteux all discussed Plaintiff's poor performance at the Gallatin store. Mattson gave her a poor evaluation in September and placed her on a PIP the next month. (See Docket No. 44–2, pp. 52–53.) Despite these warnings, the store's performance did not improve. Mattson testified that Plaintiff failed to complete any of the items on the PIP and neglected "many other things that needed attention" in her store. (Docket No. 44, Ex. 2, p. 15.)

Plaintiff also mishandled Robinson's investigation. Plaintiff's termination report states that Plaintiff was asked to "discern the facts" surrounding Robinson's potential impropriety, but "handled [the] assignment poorly." (Docket No. 44–2, p. 3.) When Mattson and Kalteux decided to transfer Robinson, Plaintiff questioned their decision and told them that she "did not want [Robinson] transferred." (Docket No. 44, Ex. 2, p. 9; Ex. 3, p. 4.) And Plaintiff remained preoccupied with Robinson for weeks. Mattson testified that Plaintiff "kept going back to Shelley and how hard [the transfer] was going to be on her." (Docket No. 44, Ex. 2, p. 15.) Even Plaintiff's email to Kalteux included a

lengthy complaint about Robinson's transfer. (See Docket No. 44–2, pp. 1–2.)

Moreover, Plaintiff repeatedly disregarded Advance's internal policies. Kalteux testified that Plaintiff "violated [Advance's] code of ethics" when she allowed Robinson to retaliate against Pettit. (Docket No. 44, Ex. 2, p. 5.) And neither party disputes that Plaintiff failed to notify Mattson of her absence on January 15, 2013, despite store policy. (See Docket No. 44, Ex. 3 ("If you're unable to show up for scheduled work, you're required to contact your immediate supervisor.").)

Second, Plaintiff has not shown that her termination was motivated by anything other than poor performance. Nor could she: the evidence shows that Mattson and Kalteux decided to fire Plaintiff because she "violated the code of ethics" during the Robinson investigation and "failed to follow the notification policy" on January 15, 2013. (Docket No. 44, Ex. 3, p. 5.) Plaintiff's termination report notes that Plaintiff had admitted that she had shared information with Robinson about her disciplinary process and allowed Robinson to harass Pettit. In doing so, Plaintiff violated Advance's no-retaliation policy, which is "inappropriate and unacceptable" behavior for a store manager. (Docket No. 44–2, p. 3.) As Mattson and Kalteux wrote, Plaintiff's "focus on Shelley [Robinson]" had led to "gross misconduct" and had "a severely detrimental effect on the store." (Docket No. 44–2, p. 4.)

Plaintiff's misconduct was enough to justify firing her. Advance's guidelines state that "[m]ultiple violations of attendance, performance and/or policy violations may" lead to disciplinary measures, "up to and including termination." (Docket No. 44–2, p. 44.) And Plaintiff admitted that, "[a]s a district leader, [Mattson] has the right to terminate" an employee for violating store policies. (Docket No. 44, Ex. 1, p. 12.) Any of Plaintiff's violations—her "lack of ef-

fort" in improving her store's performance, her "entirely inappropriate" actions during the Robinson investigation, and her "abandon[ment] of her store" on January 15, 2013—would be grounds for termination. (Docket No. 44, Ex. 2, p. 17; 44-2, p. 4.)

Plaintiff has not shown that Defendant's reasons for firing Plaintiff were pretextual. Defendant's motion on Plaintiff's ADA claim is granted.

## II. Title VII and THRA Discrimination Claims (Counts II and III)

██ Plaintiff also brings discrimination claims under Title VII and the Tennessee Human Rights Act. The same legal standard applies to both claims, so the Court considers the two claims together. See, e.g., Howington v. Quality Restaurant Concepts, LLC, 298 Fed.Appx. 436, 437 n. 1 (6th Cir.2008) (applying Title VII's standard to a THRA claim and noting that the Tennessee legislature intended the THRA "to be coextensive with federal law").

██ To establish a prima facie case under Title VII and the THRA, Plaintiff must show that (1) she is a member of a protected class; (2) she was qualified for her job; (3) she suffered an adverse employment action; (4) she was replaced by a person outside the protected class or was treated differently from similarly-situated non-protected employees. Newman v. Fed. Express Corp., 266 F.3d 401, 406 (6th Cir. 2001).

Plaintiff has met the first three elements. As a woman, she is a member of a protected class. See, e.g., Fleenor v. Hewitt Soap Co., 81 F.3d 48, 49 (6th Cir.1996). Defendant also concedes that Plaintiff was qualified and that she suffered an adverse employment action when she was fired. (See Docket No. 43, p. 4; p. 4 n.2.)

██ But Defendant argues that Plaintiff has not satisfied the fourth element—

that she was treated differently from similarly-situated male employees. Specifically, Defendant contends that "Plaintiff ... cannot identify a ... male General Manager[ ] who was treated more favorably (*i.e.*, not discharged for the same or similar infractions)." (Docket No. 43, p. 10.) Defendant notes that Plaintiff could point only to one vague memory of a "potential male [manager] who may have suffered a back injury" and was not fired. (Docket No. 43, p. 10.) This, Defendant argues, is "mere speculation" and is "not enough for Plaintiff to meet her burden" for showing a Title VII violation. (Docket No. 43, p. 10.)

■■■ The Court agrees. The fourth element requires Plaintiff to show that "all of the relevant aspects of [her] situation were nearly identical to those of the [male employee.]" Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir.1992). This entails showing that she and the male employee "dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct." Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir.1998).

Plaintiff's Complaint notes that "[o]ther male general managers have been on leave for their disability and are still employed with Defendant." (Docket No. 1, p. 6.) Beyond this, her explanation is hazy. In her deposition, she stated that the manager named Alex in "one of the Clarksville stores"—she "do[esn't] have a clue what his last name was"—had "back surgery or something." (Docket No. 44, Ex. 1, p. 23.) She admitted that she had never spoken with this man, let alone confirmed that he was ever out on leave. She even conceded that her all of her knowledge about Alex was secondhand, overheard from a coworker in a general managers' meeting.

This is not enough. Instead of specific facts, Plaintiff offers the Court a workplace rumor about an employee who was not fired for taking leave. Plaintiff cannot make out a prima facie case with an unverified story. See, e.g., Occhione v. P.S.A. Airlines, Inc., 886 F.Supp.2d 736, 745 (S.D.Ohio, 2012) (in Title VII discrimination suit, granting summary judgment in favor of defendant when plaintiff did "not substantiate[ ] a rumor" that a similarly-situated employee was treated differently). And even assuming that the rumor is true, Plaintiff's prima facie case still fails: nothing suggests that the male employee also violated the same store policies as Plaintiff. See Allen v. Ohio Dep't of Job & Family Servs., 697 F.Supp.2d 854, 887 (S.D.Ohio 2010) ("[Because the plaintiff could not] demonstrate that anyone committed the insubordination that he was charged with, he cannot establish a prima facie case of discrimination.").

Plaintiff has failed to state a prima facie case for a violation of Title VII or the THRA. The Court grants Defendant's motion for summary judgment on these counts.

### III. Title VII and the THRA Retaliation Claims (Count IV)

Plaintiff also claims that Defendant violated Title VII and the THRA by retaliating after she complained about discrimination. Because they use the same framework, the Court addresses the federal and state claims together. Howington, 298 Fed.Appx. at 437 n. 1.

■■■ To show a prima facie case for retaliation, Plaintiff must show that (1) she engaged in protected activity; (2) Defendant knew about her protected activity; (3) Defendant took an adverse employment action against Plaintiff after learning of the protected activity; and (4) there was a causal connection between the protected activity and the adverse employment action. Imwalle v. Reliance Med. Prods., Inc., 515 F.3d 531, 544 (6th Cir.2008). Plaintiff must also show that her protected activity

was a "but-for" cause of the adverse employment action. Univ. of Tex. Sw. Med. Ctr. v. Nassar, — U.S. —, —— – ——, 133 S.Ct. 2517, 2532–33, 186 L.Ed.2d 503 (2013).

Defendant argues that Plaintiff has not made this showing. In particular, Defendant contends that Plaintiff never engaged in a protected activity, since she only complained about "the general atmosphere of her store" without mentioning discrimination. (Docket No. 43, p. 12.) These "generalized complaints," Defendant notes, are not enough to satisfy the first element of Plaintiff's prima facie case. (Docket No. 43, p. 12.)

The Court agrees. Before she was fired, Plaintiff complained about her store twice: first when she wrote Tracy Kalteux an email in December 2012, and then when she called Advance's human-resources hotline in early January 2013. Nowhere in her email did Plaintiff mention discrimination. (See Docket No. 44, p. 9.) Instead, she wrote that "there ha[d] been a lot of drama in my store" and complained that it was "hard to keep [her] team motivated." (See Docket No. 44–2, p. 1.)

Plaintiff's hotline call was not much different. She told the call center that "employees ha[d] been creating drama at" the Gallatin store after Robinson's transfer, and complained that "Mattson tries to blame the incident on [Plaintiff]." (Docket No. 44–2, pp. 49–50.) She alluded to a "hostile work environment," but implied that the "employees' ... drama" was to blame. (Docket No. 44–2, p. 49.) She later testified that she was simply "looking for some support ... because [she] was in the dark about" the discipline problems at the store. (Docket No. 44, Ex. 1, p. 21.)

This is not "protected activity" under Title VII. The complaints never mentioned discrimination, nor did they suggest that Advance investigate its discriminatory practices. Instead, they brought general grievances about Mattson's management style and alleged that his close supervision was "unfair to [Plaintiff]." (Docket No. 44–2, p. 50.) This is never enough for a retaliation claim. See, e.g., Lockett v. Marsh USA, Inc., 354 ,Fed.Appx. 984, 997 (6th Cir.2009) (finding that Title VII requires a plaintiff to "make an overt stand against suspected illegal discriminatory action"); Fox v. Eagle Distrib. Co., Inc., 510 F.3d 587, 592 (6th Cir.2007) (finding that plaintiff had not engaged in protected activity when "the record does not contain any evidence that [the plaintiff] specifically alleged discriminatory employment practices").

Moreover, there is no evidence that Defendant interpreted Plaintiff's complaints to be alleging discrimination. Mattson testified that Plaintiff never made "any ... complaint" about "being harassed or discriminated against" or about "being treated any differently" after she disclosed her disability. (Docket No. 44, Ex. 2, p. 10.) And Kalteux said that Plaintiff had "absolutely not" mentioned being treated unfairly because of her disability. (Docket No. 44, Ex. 3, p. 14.)

Plaintiff has failed to show either of the first two elements of her prima facie case for retaliation. The Court will Grant Defendant's motion on this count.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's motion for summary judgment. An appropriate order will be entered.