**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0759n.06

No. 08-3413

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**Dec 03, 2009**

LEONARD GREEN, Clerk

NOVELLA LOCKETT,                                   )
                                                   )
     Plaintiff-Appellant,                     )          ON APPEAL FROM THE UNITED
                                                   )          STATES DISTRICT COURT FOR
v.                                                 )          THE NORTHERN DISTRICT OF
                                                   )          OHIO
MARSH USA, INC., et al.,                           )
                                                   )
     Defendants-Appellees,                    )

BEFORE: COLE, GIBBONS, Circuit Judges; and BELL, District Judge.[*]

**ROBERT HOLMES BELL, District Judge.** Plaintiff Novella Lockett appeals the district court's entry of summary judgment for Defendants Marsh U.S.A., Inc., Marsh & McLennan Companies, Inc. (collectively "Marsh"), and Charles Becker, on her employment discrimination claims. Lockett contends that she was demoted and terminated on the basis of her race, gender and age, and in retaliation for protected activity. She also contends that the district court lacked subject matter jurisdiction over this removed action because she only alleged state law claims. For the following reasons, we **AFFIRM**.

## I. BACKGROUND

We adopt the background facts from the district judge's well-written opinion as our own.

---

[*]The Honorable Robert Holmes Bell, United States District Judge for the Western District of Michigan, sitting by designation.

Plaintiff Novella Lockett ("Lockett") is an African-American female born on March 2, 1953. She was hired at Johnson & Higgins ("J & H") in March 1975 as an accounting clerk. Lockett earned multiple promotions throughout her time with J & H, and had attained the title Chief Administrative Officer in 1997, when Marsh USA, Inc. ("Marsh") acquired J & H. In 1999, her job responsibilities continued to include elements of human resources, technology, finance, and management services organization. Marsh's structure throughout its other regions did not contain a "Chief Administrative Officer" position. Beginning in October 1999 and continuing through January 2003, Lockett became known as the Regional Human Resources Manager, even though Jim Meathe ("Meathe"), the manager for whom she consistently worked, and some Marsh documents still referred to her as the Chief Administrative Officer. Regardless of her title, her responsibilities remained spread through finance, information technology and management services organization.

In 2001, Marsh's Great Lakes and East Central Regions merged to create a Midwest Region. This brought more responsibility for Lockett. In May 2001, Marsh hired Christopher Long ("Long") as the Regional Human Resources Manager in Chicago. Long had a Masters Degree in Labor and Industrial Relations and at least 12 years of human resources experience. Lockett, who was based in Cleveland, continued her varying duties, including human resources.

In November 2002, Meathe left Marsh and Arlene Corsetti became the Regional Leader for the Midwest Region. Corsetti assessed the region and did not understand Lockett's multi-duty responsibilities because Corsetti had no experience with a Chief Administrative Officer-type function, and Marsh did not have a chief administrative officer role in its organizational structure. Corsetti had previously worked with Long in Chicago, and saw Long as the Midwest Region HR manager. Therefore, she decided to move Lockett to Office Administrator in Cleveland. Prior to informing Lockett of the reassignment, Corsetti asked Becker his opinion and he responded with approval, proclaiming, "That would be great. The people in Cleveland like her." In her Office Administrator position, Lockett had two financial analysts who reported to her, Jeff Miles ("Miles") and Sheryl Evans ("Evans"). While Lockett received no cut in salary, her responsibilities were reduced in the new position.

Lockett contacted Barbara Silvan, Managing Director of Employee Relations, about her confusion concerning her reassignment. Silvan investigated Lockett's concerns and found no evidence of unfair treatment. She determined, however, that the Company could have done a better job of communicating to Lockett the responsibilities assumed by Long when he was hired in 2001. Thereafter, in

December 29, 2003, Lockett filed a charge of discrimination with the Ohio Civil Rights Commission ("OCRC") and Equal Employment Opportunity Commission ("EEOC") claiming she was demoted because of her race. The EEOC issued a right to sue letter on April 13, 2004, after finding it was unable to conclude that the evidence established a violation of the relevant statutes.

Approximately six months later, in October 2004, the New York Attorney General filed a civil complaint against Marsh which ultimately resulted in a settlement causing the company to pay approximately $850,000,000. Several Marsh executives, including Corsetti, resigned, and approximately 3,000 Marsh employees lost their jobs in the resulting cost-saving reduction in force ("RIF"). Lockett was among those terminated as part of the RIF on November 19, 2004. Evans, a 49-year-old white female, and Miles, a 46-year-old white male, Lockett's two subordinates who performed financial support functions in Cleveland with her, were also terminated in the RIF. No employees were hired to replace Lockett, Miles and Evans, and no financial management services organization support functions were performed in Cleveland after the RIF.

Lockett then filed a second charge with the OCRC alleging race discrimination and retaliation in her termination. The EEOC again disagreed with Lockett's allegations, finding that the evidence did not show Marsh retaliated against her or discriminated against her on account of her race. A right to sue letter was issued and Lockett then filed this lawsuit against Marsh and Becker, claiming (1) wrongful demotion on the basis of age, race and gender; (2) wrongful discharge on the basis of age, race and gender; (3) retaliatory demotion; (4) retaliatory discharge; (5) wrongful discharge in violation of Ohio public policy, and (6) intentional infliction of emotional distress.

*Lockett v. Marsh USA*, Case No. 1:06CV00035, 2007 U.S. Dist. Lexis 73939, at *2-7, (N.D. Ohio Oct. 3, 2007) (Dkt. No. 55, Mem. Op. & Order) (Lioi, J.) (citations and footnotes omitted).

The district court, in two separate opinions, entered summary judgment in favor of Marsh and Becker on all of Lockett's claims against them and denied Lockett's cross-motion for summary judgment on Count VII. Lockett filed this appeal.

**II.**

On appeal, Lockett challenges the district court's exercise of subject matter jurisdiction as well as its entry of summary judgment in favor of Defendants.

**A. JURISDICTION**

The threshold issue raised by this appeal is subject matter jurisdiction. Lockett filed her complaint in the Court of Common Pleas for Cuyahoga County, Ohio, alleging state law claims of wrongful demotion and termination based on race, age and gender, and wrongful denial of severance payments. Defendants removed the action to federal court on the basis of federal question and diversity jurisdiction.[1] Lockett did not move to remand. However, the district court *sua sponte* requested briefing from the parties on the issue of its subject matter jurisdiction. *See Klepsky v. United Parcel Serv., Inc.*, 489 F.3d 264, 268 (6th Cir. 2007) ("'[S]ubject matter jurisdiction may be raised *sua sponte* at any juncture because a federal court lacks authority to hear a case without subject matter jurisdiction,'" (quoting *Thornton v. S.W. Detroit Hosp.,* 895 F.2d 1131, 1133 (6th Cir. 1990)). The district court ultimately determined that Count VII of Lockett's complaint, which purported to assert a claim under Ohio Revised Code § 4112 based on the terms and conditions of employment, was completely preempted by § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), and was removable based on the court's original federal question jurisdiction.

---

[1]Although Defendants have acknowledged that both Lockett and Becker were citizens of the State of Ohio, Defendants contend that the district court had diversity jurisdiction in addition to federal question jurisdiction because Plaintiff joined Defendant Becker solely for the purpose of defeating the diversity jurisdiction of the court. In light of our determination that there was federal question jurisdiction, there is no need for us to consider this alternative basis for jurisdiction.

Lockett contends that the district court lacked subject matter jurisdiction because all eleven counts in her complaint were based upon either Ohio common law or Ohio statutory requirements, and no federal claims were intended, alleged, or referenced. We review "'*de novo* the existence of subject matter jurisdiction as a question of law,'" but we review factual determinations regarding jurisdictional issues for clear error. *Grand Trunk W. R.R. Inc. v. Bhd. of Maint. of Way Employees Div.*, 497 F.3d 568, 571 (6th Cir. 2007) (quoting *Wright v. Gen. Motors Corp.*, 262 F.3d 610, 613 (6th Cir. 2001)).

The district court determined that Count VII of Lockett's complaint, which asserted a claim under Ohio Revised Code § 4112 based on the terms and conditions of employment, was an action "by a participant or beneficiary [in an ERISA plan] to recover benefits due to [her] under the terms of [her] plan" and "to enforce [her] rights under the terms of the plan," 29 U.S.C. § 1132(a)(1)(B),[2] and that it was completely preempted by federal law. We agree.

As a general rule, a cause of action arises under federal law only when issues of federal law appear on the face of the plaintiff's "well-pleaded complaint." *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (1987); *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 325 (6th Cir.

---

[2]Section 502(a) of ERISA provides that a civil action may be brought--

(1) by a participant or beneficiary--

    (A)  for the relief provided for in subsection (c) of this section, or
    (B)  to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan . . . .

29 U.S.C. § 1132(a)(1)(B).

2007). Complete preemption is "a narrow exception to the well-pleaded complaint rule." *AmSouth Bank v. Dale*, 386 F.3d 763, 776 (6th Cir. 2004). Complete preemption applies in situations where "Congress has indicated an intent to occupy the field so completely that any ostensibly state law claim is in fact a federal claim for purposes of arising-under jurisdiction." *Id.* Any complaint raising this select group of claims is necessarily federal in character and, as such, may be removed to federal court. *Metro. Life*, 481 U.S. at 63-64; *Gentek*, 491 F.3d at 325.

ERISA contains an integrated enforcement mechanism in § 502(a), 29 U.S.C. § 1132(a), that is "essential to accomplish Congress' purpose of creating a comprehensive statute for the regulation of employee benefit plans." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004). Accordingly, "[a]ctions that could have been brought under § 1132, 'where there is no other independent legal duty that is implicated by a defendant's actions,' are completely preempted by § 1132." *Thurman v. Pfizer, Inc.*, 484 F.3d 855, 860 (6th Cir. 2007) (quoting *Davila*, 542 U.S. at 210).

To come within the complete preemption exception "a court must conclude that the common law or statutory claim under state law should be characterized as a superseding ERISA action 'to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan,' as provided in § 1132(a)(1)(B)." *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 468 n.11 (6th Cir. 2002) (quoting *Warner v. Ford Motor Co.*, 46 F.3d 531, 533-34 (6th Cir. 1995)).

Lockett alleged in Count VII that she was discriminated against because she was offered a lesser severance package than others and because the severance package required her to release

Defendants from any and all of her potential claims for wrongful and illegal treatment. Lockett contends that she was entitled to receive enhanced severance benefits under the Marsh 2004 Restructuring Severance Pay Plan (the "Plan") irrespective of any release of claims. She therefore asserts that she was denied full participation in the Plan.

The Plan is governed by ERISA. Nevertheless, Lockett contends that any relationship between the discrimination claim in Count VII and the Plan is tangential, at best, and should be governed by the analysis in *Wright*, 262 F.3d at 614-15. In *Wright,* we reversed the district court's finding that ERISA completely preempted the plaintiff's state law claims because ERISA benefits were merely a component of the plaintiff's discrimination claim:

> Hers is not a lawsuit claiming wrongful withholding of ERISA covered plan benefits; it is a lawsuit claiming race and sex discrimination and retaliation resulting in damages, one component of which is a sum owed under the provision of the GM plan.

*Id.* at 615.

*Wright* does not suggest that a plaintiff can avoid complete preemption by avoiding reference to ERISA. As we noted in *Wright*, if the claim under state law should be characterized as a superseding ERISA action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan," as provided in § 1132(a)(1)(B), it falls within the complete preemption exception to the well-pleaded complaint rule. *Wright*, 262 F.3d at 614 (quoting *Warner*, 46 F.3d at 534 (quoting §1132)). "It is not the label placed on a state law claim that determines whether it is preempted, but whether in essence such a claim is for the recovery of an ERISA plan benefit." *Peters*, 285 F.3d at 469.

In *Peters,* the district court determined that the plaintiff's claim that the company breached its promise to continue his participation in its retirement plan was properly characterized as an ERISA action to recover benefits or to clarify rights under an ERISA plan, and that it was completely preempted under ERISA. *Id.* at 468. In affirming the district court's decision, we distinguished wrongful discharge cases in which the plaintiff's incidental damages award merely included a loss of benefits under an ERISA plan, and related only peripherally to the ERISA plan. *Id.* at 469. In contrast to those cases, we determined that the plaintiff's claim in Peters – that the company wrongfully denied him continued participation in the plan – was a claim arising under ERISA's civil enforcement provisions. *Id.* at 468-69.

In Count VII, Lockett claimed that she had a right to participate in the enhanced severance benefit option under the Plan and that Marsh wrongfully denied her that option. In contrast to the Plaintiff's claim in *Wright*, Lockett's claim for enhanced severance benefits is not merely one component of her claim of discrimination. It is a stand-alone claim asserting that she was unlawfully denied full participation in the ERISA Plan because she refused to comply with the allegedly illegal terms of the Plan that conditioned receipt of enhanced severance benefits on the signing of a waiver. Count VII of Lockett's complaint, like the claim at issue in *Peters*, is a claim to recover benefits due under the terms of the Plan, and to enforce her rights under the terms of the Plan. As such, Count VII falls squarely within the civil enforcement provisions of ERISA. Her claim for severance benefits is completely preempted by ERISA and the district court properly exercised subject matter jurisdiction over Count VII on the basis of complete federal preemption.

In addition, because the district court had original jurisdiction over Count VII, it properly exercised supplemental jurisdiction over the remaining state law claims. 28 U.S.C. § 1367 ("[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy.").

**B. ERISA CLAIM**

Lockett contends that the district court erred in granting summary judgment in favor of Marsh on Lockett's claim for enhanced benefits under the Plan, because she presented sufficient evidence to create a triable claim under §§ 502 and 510 of ERISA, 29 U.S.C. §§ 1132, 1140.

We review the district court's summary judgment rulings *de novo*. *Univ. of Pittsburgh v. Townsend*, 542 F.3d 513, 522 (6th Cir. 2008). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

In support of her § 502 claim, Lockett asserts that she was wrongfully denied benefits under an ERISA plan.

The district court entered summary judgment in favor of Marsh on Lockett's § 502 claim, reasoning that, because Lockett did not sign a waiver as required by the terms of the Plan, Marsh's failure to provide enhanced severance benefits was in accordance with the terms of the Plan.

In determining whether Lockett was entitled to the enhanced severance benefits, we look to the language of the Plan. In interpreting ERISA plans we apply federal common law rules of contract interpretation and give effect to the unambiguous terms of the plan. *Univ. Hosps. of Cleveland v. S. Lorain Merch. Ass'n*, *Health & Welfare Benefit Plan & Trust*, 441 F.3d 430, 437 (6th Cir. 2006). We interpret ERISA plan provisions "'according to their plain meaning, in an ordinary and popular sense.'" *Cassidy v. Akzo Nobel Salt, Inc*., 308 F.3d 613, 617-18 (6th Cir. 2002) (quoting *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 556 (6th Cir. 1998)). The clear and unambiguous terms of the Plan provide that only Plan participants who signed and did not revoke a Waiver and Release Agreement ("Waiver") would be eligible to receive enhanced severance pay. The Plan did not give the administrator discretion to authorize enhanced severance pay to Plan Participants who did not sign the Waiver. Lockett did not sign the Waiver. Accordingly, because she failed to comply with the express Plan requirements for the enhanced severance pay, the district court properly found that Marsh could not be held liable under § 502 for the wrongful denial of ERISA benefits.

On appeal, Lockett contends that she could not be required to sign the Waiver as a precondition of receiving the enhanced severance benefits because the Waiver illegally required her to refrain from participating in clearly protected activity.

We rejected a similar argument in *EEOC v. SunDance Rehabilitation Corp*., 466 F.3d 490 (6th Cir. 2006). In *SunDance*, the EEOC alleged that the employer's offer of severance pay not otherwise owed to discharged employees, in exchange for promises not to sue or file administrative charges, violated the anti-retaliation provisions of various federal equal employment opportunity statutes.

10

*Id.* at 492. While we observed that we had previously expressed approval of a rule that a waiver of the right to file a charge with the EEOC is void as against public policy, we declined to rule on the enforceability of the promise not to sue in *SunDance.* *Id.* at 499 (citing *EEOC v. Frank's Nursery & Crafts, Inc.*, 177 F.3d 448, 456 (6th Cir. 1999)). Instead, we held that whether or not the promise not to sue was enforceable, the employees had not been deprived of anything by the mere offer of severance pay conditioned on a promise not to sue:

> Those who choose to accept it are better off, by receiving a benefit that was not "part and parcel of the employment relationship". . . . Those employees who reject the agreement obviously do not give up any rights. And, as we have noted above, employees may, if they wish, accept the agreement and argue later that parts of it may be unenforceable under existing or expanded precedent. Under these circumstances, simply offering the Agreement is not facially discriminatory.

*Id.* at 501.

The same reasoning defeats Lockett's claim of wrongful denial of benefits. Marsh had no duty to offer the enhanced severance package. Even if the Waiver was against public policy, it was not illegal for Marsh to condition the payment of severance benefits, not otherwise owed, on the signing of the Waiver. The Waiver itself only required the participant to agree to the Waiver "to the extent consistent with applicable law." The Waiver also contained a severability provision, which provided that a determination that any clause was unenforceable would not affect the enforceability of the remainder of the agreement. The legality of the Waiver could have been challenged after the Waiver was signed. The district court correctly concluded on this record that Lockett failed to present evidence that she was entitled to benefits under the Plan, which is a required showing under § 502.

11

Lockett also contends that the evidence supports an interference claim under ERISA § 510, 29 U.S.C. § 1140. Section 510 makes it "unlawful for any person to . . . discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . . ." 29 U.S.C. § 1140. Section 510 offers protection against interference with the attainment of a right under ERISA. *Coomer v. Bethesda Hosp., Inc.*, 370 F.3d 499, 506 (6th Cir. 2004). To establish a violation of § 1140, Lockett was required to demonstrate that Marsh had "a specific intent to violate ERISA through either direct or circumstantial evidence." *Schweitzer v. Teamster Local 100*, 413 F.3d 533, 537 (6th Cir. 2005). In the absence of direct evidence, Lockett could make out a prima facie case by showing the existence of (1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee was entitled. *Id*.

On *de novo* review we conclude that the district court properly found that Lockett's § 510 interference claim failed because all employees were offered the same Plan, and because Lockett did not produce any evidence to indicate that Marsh had a specific intent to violate her rights under ERISA.

## C. DISCRIMINATION CLAIMS

The third issue raised in this appeal is whether the district court erred in granting summary judgment in favor of Defendants on Lockett's state law discrimination claims. Lockett contends that the district court ignored certain favorable evidence and failed to make all reasonable inferences in

her favor. She contends that she presented sufficient evidence to create issues of material fact for trial as to whether her demotion and/or her termination were the result of illegal discrimination based on her race, gender, and/or her age.

Lockett brought her race, gender, and age[3] discrimination claims pursuant to Ohio Revised Code § 4112.02.[4] In evaluating discrimination claims under Chapter 4112, Ohio courts look to federal case law interpreting Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., and apply the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden- shifting framework. *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E. 2d

---

[3]Defendants contend that Lockett's age discrimination claims are time-barred and subject to dismissal because they were not brought within 180 days of the alleged discriminatory demotion and termination as required by Ohio Revised Code § 4112.02(N). *Dunn v. Medina Gen. Hosp.*, 917 F. Supp. 1185, 1192 (N.D. Ohio 1996); *Vickers v. Wren Indus., Inc.*, No. Civ.A. 20914, 2005 WL 1685101, at *3 (Ohio Ct. App. July 8, 2005). Lockett contends that her complaint, which refers generally to Chapter 4112, should be liberally construed to accomplish the purposes of Chapter 4112, and that it should be deemed timely pursuant § 4112.14, which is governed by a six-year limitations period. *See* Ohio Rev. Code § 4112.14; *Ziegler v. IBP Hog Market, Inc.*, 249 F.3d 509, 518 (6th Cir. 2001); *Ferraro v. B.F. Goodrich Co.*, 777 N.E. 2d 282, 291 (Ohio Ct. App. 2002) (applying six-year limitations period where complaint referred to Chapter 4112 generally). The timeliness of Lockett's age discrimination claim was not addressed by the district court. Because we conclude that Lockett has failed in any event to establish a claim of age discrimination, we need not address Defendant's alternative argument that her age discrimination claim is time-barred.

[4]Under Ohio law it is an unlawful discriminatory practice:

For any employer, because of the race, color, religion, sex, military status, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

Ohio Rev. Code § 4112.02(A).

128, 131 (Ohio 1981). Under the *McDonnell Douglas* burden-shifting framework "[t]he burden is first on the plaintiff to demonstrate a prima facie case of [] discrimination; it then shifts to the employer to offer a legitimate, non-discriminatory explanation for its actions; finally, the burden shifts back to the plaintiff to show pretext-i.e. that the employer's explanation was fabricated to conceal an illegal motive." *Chen v. Dow Chem. Co.*, No. 08-1597, — F.3d —, 2009 WL 2851351 (6th Cir. Sept. 8, 2009).

To establish a *prima facie* case of race, gender, or age discrimination based on wrongful demotion or termination, Lockett was required to demonstrate that (1) she is a member of a protected class,[5] (2) she was subjected to an adverse employment action, (3) she was qualified, and (4) she was replaced by someone outside of the protected class. *Geiger v. Tower Auto.*, 579 F.3d 614, 622 (6th Cir. 2009) (age discrimination). "If the termination arises as part of a work force reduction, this court has modified the fourth element to require the plaintiff to provide 'additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons'" *Id.* at 623 (quoting *Barnes v. GenCorp*, 896 F.2d 1457, 1465 (6th Cir. 1990)); *see also Campbell v. PMI Food Equip. Group, Inc.*, 509 F.3d 776, 785-86 (6th Cir. 2007) (same). Eliminating a single job is sufficient to constitute a legitimate reduction in force. *See Barnes*, 896 F.2d at 1465 ( a RIF "occurs when business considerations cause an employer to eliminate one or more positions"). "The ultimate question in every employment discrimination case

---

[5]For an age discrimination claim, a plaintiff is a member of the protected class if she was at least forty years old at the time of the alleged discrimination. Ohio Rev. Code § 4122.14; *Bush v. Dictaphone Corp.*, 161 F.3d 363, 368 (6th Cir. 1998).

involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000).

### 1. Discriminatory Demotion Claim

The district court found that Lockett satisfied the first three prongs of her *prima facie* case of discriminatory demotion. She is an African-American woman over the age of forty, her reassignment or demotion to the position of Office Administrator qualified as an adverse employment action,[6] and she was qualified for her position as Chief Administrative Officer. However, the district court found that Lockett failed to satisfy the fourth prong of her *prima facie* case because she was not replaced by Long, and because she did not produce additional direct, circumstantial, or statistical evidence tending to indicate that she was singled out for demotion for impermissible reasons.[7]

Lockett challenges both of these conclusions on appeal. She contends that she was replaced by Long, and that, even if she was not replaced, she presented sufficient additional evidence to create an issue of fact as to whether she was demoted for impermissible reasons.

---

[6]The record shows that Lockett's previous position as Chief Administrative Officer or as Regional Human Resources Manager in the Cleveland office was eliminated, and that she was reassigned to the position of Administrative Officer for Ohio and Kentucky. Lockett has presented sufficient evidence from which a reasonable jury could conclude that the reassignment, which carried less responsibility and less opportunity for compensation and growth, was a demotion. Accordingly, for purposes of this opinion we will characterize her reassignment as a demotion.

[7]Because Lockett relied on the same evidence for meeting the fourth prong of the *prima facie* case and for establishing pretext, the district court merged the two analyses.

"A person is not considered replaced when his duties are absorbed by another person 'or when the work is redistributed among other existing employees already performing related work.'" *Geiger*, 579 F.3d at 623 (quoting *Barnes*, 896 F.2d at 1465). In *Geiger* we found that the plaintiff had not been replaced because his position at one facility was consolidated with a comparable position at a second facility, and the person selected for the consolidated position was performing the plaintiff's former duties in addition to her own former duties. *Id.*

Soon after Long was hired in May of 2001, many of Lockett's human resources responsibilities were transitioned over to him. Human resources managers who had previously reported to Lockett began reporting to Long. When Corsetti assumed the role as head of Marsh's Chicago office in the fall of 2001, it was her understanding that Long was the Regional Human Resources Manager. Accordingly, when Lockett's Chief Administrative Officer position was eliminated in January of 2003, Long merely assumed Lockett's remaining human resources responsibilities while continuing to perform his own. On this record, the district court correctly concluded that there was no evidence to support Lockett's contention that she was replaced by Long.

Because this is a work force reduction case, the evidence must be sufficiently probative to allow a fact-finder to believe that Defendants intentionally discriminated against Lockett because of her race, gender or age. *See Geiger*, 579 F.3d at 624 (citing *Gragg v. Somerset Tech. Coll.*, 373 F.3d 763, 767-68 (6th Cir. 2004)).

Lockett contends that she presented sufficient additional evidence to support her contention that Marsh singled her out for demotion for impermissible reasons, including her superior work

16

performance, her engagement in protected activity, and a long history of racial and gender animus in the Cleveland office.

Lockett's evidence of her superior performance does not suggest discrimination because Corsetti did not reassign Lockett on the basis of her performance. Although Lockett continued to hold the title of Regional Human Resources Manager after Long was hired, she was simultaneously referred to on organizational charts as Chief Administrative Officer, and her actual work was not limited to human resources matters. Lockett's role in the Cleveland Office was unique. She was involved in various aspects of human resources, finance, technology, and management services organization. There was no similar position in the Marsh corporate structure. When Corsetti became the head of Marsh's Midwest Region in November 2002, she assessed the region to see how to make the organization more viable in the future. Corsetti made it her goal to structure the Midwest Region in a manner that was more consistent with the other Marsh regions. To accomplish this goal, Corsetti eliminated Lockett's multi-faceted position; transferred Lockett's human resources responsibilities to Long, the Regional Human Resources Manager; and offered Lockett a position as the MSO Office Administrator for the Ohio and Kentucky offices. Lockett was not the only person in the Cleveland office who was affected by Corsetti's efforts to bring the region into conformity with Marsh's other regions. Corsetti also changed the roles of Kevin Youngs and Tom Sewell, two white males, because their responsibilities did not comport with Marsh's organizational structure.

17

Lockett also contends that the discriminatory nature of her demotion is evidenced by the fact that it occurred shortly after Lockett challenged discriminatory practices at Marsh in the Sirotzky report. In July of 2002, Meathe and Corsetti asked Lockett to conduct a performance review of Sara Sirotzky, an employee in the Chicago office who had expressed an interest in moving-up in the corporation. Lockett interviewed Sirotzky's subordinates, peers, and managers and prepared a memorandum of the feedback she received and her recommendations.

Although Meathe thought the report was well done, Brian Goshen, head of human resources for Marsh North America, ordered that the report be destroyed because it was not professional and objective. Goshen wanted the report to be redone, with recommendations that were objective and business-based.

Lockett concluded that Corsetti had been discriminating against Sirotzky on the basis of her gender and national origin. Lockett contends that Goshen ordered her report destroyed and Corsetti demoted her because of her allegations of discrimination.

Whatever subjective beliefs Lockett might have had concerning Corsetti's discriminatory treatment of Sirotzky, those subjective beliefs did not appear in the Sirotzky report. The Sirotzky report did not state or even suggest that Corsetti or anyone else at Marsh had discriminated against Sirotzky. The report simply described how Sirotzky was viewed by her colleagues and suggested that the reason that she was not embraced by her peers was because of her direct and expressive style, which was a reflection of her Peruvian culture. The report stated that, for Sirotzky to succeed as a sales professional, the environment would have to be "inclusive" and Sirotzky would have to

be "sensitive to the social styles that are effective with her peers." The report indicated that there was a disconnect between Sirotzky's high performance rating and her failure to receive a raise or stock options. The report did not recommend that an investigation be initiated into Sirotzky's treatment, or that anyone be disciplined or counseled about discriminatory behavior. Neither Goshen nor Corsetti understood the report to be an allegation of discrimination. Lockett was never reprimanded or disciplined in any fashion for the report. No inference can be raised from the Sirotzky report that Corsetti's subsequent demotion of Lockett was motivated by race, gender or age discrimination, and Lockett has presented no other evidence to suggest that Corsetti had any gender, racial or age animus.

Nor does Lockett's contention that Charles Becker had a long history of racial and gender animus toward her suggest that Lockett's demotion was motivated by discriminatory animus. "Any discriminatory statements must come from decisionmakers to constitute evidence of discrimination." *Geiger*, 579 F.3d at 620-21. "Statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself [cannot] suffice to satisfy the plaintiff's burden . . . of demonstrating animus." *Id.* (quoting *Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998)). There is no evidence that Becker had any role in the elimination of Lockett's position as Chief Administrative Officer. The decision to demote Lockett was a decision made by Corsetti, not by Becker. In *Johnson v. Kroger Co.*, 319 F.3d 858 (6th Cir. 2003), we held that the dicriminatory comments and behavior of a manager who supervised the plaintiff, assisted in her performance review, and consulted with the decisionmaker prior to the plaintiff's demotion, played a significant

19

role in the decisionmaking process and was sufficient to raise an issue of fact as to discriminatory intent. *Id.* at 868. In contrast to *Johnson*, in this case there is no evidence that Becker had any ability to influence Corsetti's decision to eliminate the Chief Administrative Officer position. Although Corsetti sought Becker's approval of Lockett's new role as Office Manager, his approval of her new role does not suggest that he had any input into the elimination of her previous role. Moreover, none of the statements Lockett attributes to Becker were related in any way to the decision to eliminate her Chief Administrative Officer position. Accordingly, Becker's remarks are not sufficient to show discriminatory motive in Lockett's demotion. Furthermore, as documented by the district court, Becker's remarks regarding "church lady" and "token" were stray remarks, and his gender-related comments were not even directed at Lockett. None of Lockett's factual assertions, singly or in combination, is sufficient to meet the heightened evidentiary standard required to meet the fourth prong of her *prima facie* case.

Even if we were to assume that the evidence Lockett presented met the heightened standard and established a *prima facie* case of discrimination, Lockett nevertheless has not established that Defendants' stated reason for her demotion was pretext. In order to establish that an employer's legitimate non-discriminatory reason is pretext, a plaintiff is required to show that the proffered reason had no basis in fact, did not actually motivate the adverse action, or was insufficient to motivate the adverse action. *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 545 (6th Cir. 2008) (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)); *see*

*also Chen*, 2009 WL 2851351, at *5, n.4 ("Pretext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?").

Marsh articulated a legitimate non-discriminatory reason for Lockett's demotion: Corsetti's decision to bring the Midwest region in line with the Marsh organizational structure. "As we have oft times repeated, 'it is inappropriate for the judiciary to substitute its judgment for that of management.'" *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004) (quoting *Smith v. Leggett Wire Co.*, 220 F.3d 752, 763 (6th Cir. 2000)); *see also Manofsky v. Goodyear Tire & Rubber Co.*, 591 N.E.2d 752, 755-56 (Ohio Ct. App. 1990) ("As a general rule, the judiciary will not second guess business judgments by an employer making personnel decisions."). Lockett has not presented any evidence to support a finding that Corsetti's stated reason for the demotion was false, that it did not actually motivate the demotion, or that it was not sufficient to motivate the demotion.

## 2. Discriminatory Discharge Claim

The district court found that Lockett's termination claim, like her demotion claim, was subject to summary judgment because Lockett failed to present additional evidence tending to show that she was singled out for termination for impermissible reasons, or, in the alternative, because she could not prove pretext.

In the fall of 2004, after entering into the costly settlement of the New York civil litigation, Marsh began efforts to reduce its expenses by reducing its workforce and restructuring its business model. As part of this process Pat Hageman, the North America CFO, Corsetti, the head of the Midwest Region, and Tatum, the Regional Advisor in charge of MSO functions, made the decision

to eliminate the financial function in the Cleveland Office. Lockett and two other financial analysts in the Cleveland office were terminated.

Lockett concedes that she was not replaced after her termination. However, she contends that she presented sufficient additional direct, circumstantial and statistical evidence to create an issue of fact for trial on the discriminatory basis for her discharge. She relies in part on the same evidence she presented with respect to her demotion: her exemplary performance, the Sirotzky report, and Becker's discriminatory comments. This evidence fails for essentially the same reasons discussed in relation to Lockett's demotion. There is no evidence that the decision to eliminate the financial function in the Cleveland office was based on performance, so Lockett's evidence of her good performance does not tend to show discriminatory animus. Lockett has not shown that Corsetti used the Sirotzky report against her after her demotion. And, just as in the case of Lockett's demotion, Becker was not involved in the decision to eliminate the financial function or to terminate Lockett, so Lockett's reliance on Becker's discriminatory statements does not help her make out her *prima facie* case.

Lockett also relies on additional evidence that subsequent to her demotion she was excluded from various executive meetings, she was falsely accused of failing to turn in assignments, and she became the target of a year-long effort to orchestrate her termination. Lockett contends that after her demotion to Office Administrator, she was removed from various executive and other meetings and kept off important committees. While Lockett worked under Meathe, she was involved in all facets of the Cleveland office. After Corsetti restructured the Cleveland office to bring it in line with

Marsh's corporate structure, Lockett's involvement in company matters was more limited, and it stands to reason that her involvement in meetings and committees would also decrease. Lockett has not suggested that she was excluded from meetings that were necessary to her job functions. More importantly, Lockett has not shown how her exclusions from meetings or committees evidence discrimination on the basis of her race, gender or age.

Lockett contends that in March of 2003, Corsetti falsely accused her of failing to timely submit a report. The evidence reflects that Corsetti questioned Lockett about the missing report and that Corsetti subsequently learned that Lockett had prepared the report and properly submitted it to Joseph Tatum, the Regional Advisor, to whom Lockett reported, but that Tatum had failed to forward it to Corsetti. There was an oversight, it was corrected, and there is no evidence that the false accusation resulted in discipline or that it was used against Lockett in any fashion. The false accusation is not evidence of pretext.

Finally, Lockett contends that the reason given for her termination, the reduction in force, was pretext, because Long's handwritten notes dated November 10, 2003, indicate that she was being singled out for termination long before the reduction in force was contemplated. The notes Lockett relies on provide: "she thinks she has a terrific case & she would use our offer to prove discrimination;" and "lets [sic] go down the performance route." The notes appear to relate to a discussion concerning Lockett's first EEOC charge and whether to offer Lockett a settlement or defend against her charge of discriminatory demotion. There is nothing in the record to suggest that Long was involved in the decision to terminate Lockett or that his notes reflect the opinions of those

23

who were responsible for Lockett's termination. *See Geiger*, 579 F.3d at 624 ("Rokicki's statements about a possible age discrimination suit still do not constitute evidence of age discrimination because he was not the one making the hiring decision.").

Lockett has not come forward with sufficient evidence to show that the legitimate business reason articulated by Marsh for her discharge, i.e., the reduction in force, including the elimination of the entire financial unit in Cleveland, was pretext. On this record, no reasonable jury could conclude that Lockett was the victim of intentional discrimination on the basis of her gender, race, or age.

### D. RETALIATION CLAIM

Lockett contends that the district court erred in granting summary judgment to Defendants on her retaliation claim because she contends that she presented sufficient evidence that she was demoted in retaliation for writing the Sirotzky report and that she was terminated in retaliation for filing the EEOC charge.

Ohio law makes it unlawful to discriminate against those who oppose any unlawful discriminatory practice, or who make a charge, or participate in any discrimination investigation or proceeding. Ohio Rev. Code § 4112.02(I). Ohio courts rely on federal case law and apply the *McDonnell Douglas* burden-shifting framework in reviewing employment discrimination and wrongful retaliation claims under Ohio law. *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Oh. Civil Rights Comm'n,* 421 N.E. 2d 128, 131-32 (Ohio 1981); *Peterson v. Buckeye Steel Casings*, 729 N.E.2d 813, 821-22 (Ohio Ct. App. 1999).

To establish a *prima facie* case of retaliation under Ohio law, Lockett was required to demonstrate that:

> (1) she engaged in a protected activity, (2) the defending party was aware that the claimant had engaged in that activity, (3) the defending party took an adverse employment action against the employee, and (4) there is a causal connection between the protected activity and adverse action.

*Greer-Burger v. Temesi*, 879 N.E.2d 174, 180 (Ohio 2007). "'In order to engage in a protected opposition activity . . . a plaintiff must make an overt stand against suspected illegal discriminatory action.'" *Coch v. Gem Indus., Inc.*, No. L-04-1357, 2005 WL 1414454, at *5 (Ohio Ct. App. June 17, 2005) (quoting *Comiskey v. Auto. Indus. Action Group*, 40 F. Supp. 2d 877, 898 (E.D. Mich. 1999)). "Vague charges of discrimination do not invoke the protection of the law." *Id.* "[A] vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice." *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1313 (6th Cir. 1989) (holding that complaints about ethnocism were too vague to constitute protected activity); *see also Fox v. Eagle Distrib. Co., Inc.*, 510 F.3d 587, 592 (6th Cir. 2007) (holding that the plaintiff's statements about suing the company were not protected where they did not specifically allege discriminatory employment practices).

Lockett's Sirotzky report is not protected opposition activity. The report did not take an overt stand against suspected illegal discriminatory action; it did not even mention the term discrimination; it did not suggest the need for an investigation into discriminatory practices; and there is no evidence that either Goshen or Corsetti understood the report to be charging discrimination.

Unlike the Sirotzky report, Lockett's EEOC charge was protected activity. Nevertheless, Lockett has not shown a casual connection between her filing of the EEOC charge and her termination. Lockett was terminated in a December 2004 workforce reduction that had nothing to do with the EEOC charge she filed twelve months earlier. Moreover, Lockett has not demonstrated that the legitimate business reason articulated for her termination was a pretext for discrimination. Finally, as noted above, Lockett has not demonstrated that the articulated basis for her demotion was pretext. *See Chen*, 2009 WL 2851351, at *6 (finding no need to address whether the plaintiff established a *prima facie* case of retaliation where she failed to create an issue of fact as to pretext for her termination in connection with her discrimination claim).

### E. PUBLIC POLICY CLAIM

Lockett's public policy claim is based on the same facts as her retaliation claim. She alleges that her termination contravened clear public policy concerning her right to prepare reports detailing discrimination and her right to file charges of discrimination.

Under Ohio law, where statutory remedies adequately protect the public policy by discouraging the wrongful conduct, no common-law public-policy claim will be recognized. *Meyer v. United Parcel Serv., Inc.*, 909 N.E.2d 106, 114 (Ohio 2009). Because Ohio has a comprehensive remedial statute for addressing retaliatory termination claims that is sufficient to protect the public policy against retaliatory terminations, Lockett cannot maintain a separate common-law public-policy claim. Moreover, even if such a claim were cognizable, it fails for the same reason as

Lockett's underlying retaliation claim.  *See Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 568-69 (6th Cir. 2003).

## F.  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM

Ohio recognizes a claim for intentional infliction of emotional distress.  Under Ohio law, "'[o]ne who by extreme and outrageous conduct intentionally or recklessly causes serious emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.'"  *Stockdale v. Baba*, 795 N.E.2d 727, 735 (Ohio Ct. App. 2003) (quoting *Yeager v. Local Union 20*, 453 N.E.2d 666, syllabus (Ohio 1983)).  "[T]he wrongful interference or termination of an employment relationship may be so extreme and outrageous as to constitute the egregious conduct necessary to support the tort of intentional infliction of emotional distress." *Yungkau v. Dean Witter Reynolds, Inc*., 628 F. Supp. 23, 25 (S.D. Ohio 1985).  However, "an employee's termination, even if based upon discrimination, does not rise to the level of 'extreme and outrageous conduct' without proof of something more."  *Godfredson v. Hess & Clark, Inc*., 173 F.3d 365, 376 (6th Cir. 1999).

The evidence regarding the circumstances of Lockett's demotion and termination are not so "extreme and outrageous" as to support an intentional infliction of emotional distress claim.

## II.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment in favor of Defendants on all counts of Plaintiff's complaint.

*Lockett v. Marsh*
No. 08-3413